# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57205-2-II |
| Respondent, | |
| v. | |
| ANTHONY RAY BROWNFIELD, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, A.C.J. — HB reported to law enforcement that her father, Anthony Ray Brownfield, sexually abused her when she was a child. A jury ultimately found Brownfield guilty of three counts of child rape. At trial, the State played a video recording for the jury of an investigating officer, Detective Brandon Stoppani, interviewing Brownfield about the rape allegations. Brownfield argues that at two points during that interview, he invoked his right to remain silent and as such, the trial court violated his Fifth Amendment right by admitting the statements after holding a CrR 3.5 hearing. He contends that this amounted to prejudicial error and asks this court to reverse his convictions and remand for a new trial.

The State responds that Brownfield waived his right to remain silent in the first instance, and he did not unequivocally invoke his right to remain silent in the second instance. Additionally, the State contends that Brownfield failed to preserve error regarding the second alleged invocation. Finally, the State argues that the admission of the video of the interview was harmless because overwhelming untainted evidence necessarily leads to a finding of guilt.

We agree with State and hold that no constitutional error occurred because Brownfield's first invocation of his right to remain silent was immediately revoked, rendering it equivocal, and what he claims was a second invocation was not an invocation at all when taken in context. Accordingly, we affirm.

FACTS

I. UNDERLYING CHARGE & CUSTODIAL INTERROGATION

In July 2022, the State charged Brownfield with three counts of rape of a child in the first degree and one count of child molestation in the first degree. All counts were classified as domestic violence against a family or household member, as the victim was Brownfield's daughter, HB. The crimes occurred between June 2002 and April 2006. HB was five years old when the abuse began.

HB reported the crimes to law enforcement for the first time in 2016, when she was pregnant with her first child. She reported the abuse to Brandon Stoppani, a detective with the Clallam County Sheriff's Office. Detective Stoppani interviewed HB in 2019. Stoppani asked HB on multiple occasions if she wished to press charges, but she initially declined out of fear of the turmoil that the ordeal would cause her and her family. Eventually, HB told Stoppani that she was ready to move forward and press charges. In February 2020, Stoppani worked with HB on a wire order and encouraged her to attempt to elicit a confession from Brownfield by messaging him.

Detective Stoppani interviewed Brownfield at the Sequim Police Department. At the beginning of the interview, after Stoppani read Brownfield his Fifth Amendment rights, the following exchange occurred:

> DETECTIVE STOPANNI: So do you understand each of these rights as I've explained them to you?
> MR. BROWNFIELD: Mm-hmm.

DETECTIVE STOPPANI: Having these rights in mind, do you wish to talk to me now?
MR. BROWNFIELD: No.
DETECTIVE STOPPANI: You don't wish [inaudible] --
MR. BROWNFIELD: -- You can talk. You can talk all you want. I'll listen.
DETECTIVE STOPPANI: Okay. Um, so at this time, you're willing to talk to me, but you might not say anything. Am I correct in what I'm understanding?
MR. BROWNFIELD: Mm-hmm.
DETECTIVE STOPPANI: Okay. So what I wanted to –

Verbatim Rep. of Proc. (VRP) (CrR 3.5 hearing) at 3-4. Roughly five minutes after the interview began, the following exchange between Stoppani and Brownfield occurred:

STOPPANI: You say that things can be explained in court but I'm going to give you a chance to try and explain what she's told me, because when a girl comes onto a guy, it's kind of odd, so is that, is that what went down?
BROWNFIELD: Maybe. I don't care to talk about this, I feel disgusted with myself given this whole situation. Just f***ing kill me or I'll kill myself. It's all over. My life is over. Everything is over.

Ex. 4 at 10 min., 48 sec. The interview continued:

BROWNFIELD: Yeah, I was a piece of shit. I f***ing can't, I couldn't. Yeah, my daughter came onto me so f***ing what. I was f***ing weak.
STOPPANI: [Inaudible] making you weak at the time? [Pause.] I mean is that your, is that your character? Has it happened since? Or is it --
BROWNFIELD: No.
STOPPANI: So is it just a one, not a one time but a one event thing?
BROWNFIELD: Yeah. I've been disgusted with myself ever since.

*Id.* at 10 min., 49 sec.

Brownfield went on to make self-incriminating statements during the interview. He admitted to engaging in various sexual acts with HB, including licking her vagina and touching her inappropriately. He also admitted to touching her with his penis and ejaculating on her. When asked about the allegations of sexual abuse, he said that HB was not lying.

3

## II. CrR 3.5 Hearing

On June 28, 2022, the trial court held a CrR 3.5 Hearing. The trial court listened to Stoppani's interview of Brownfield, including the reading of the rights. In its oral ruling, the court found that Brownfield was in custody during the interview, and that Brownfield "did agree to waive" his Fifth Amendment rights. 1 VRP at 162. The court found that although Brownfield initially invoked his right to remain silent, he introduced "equivocation" and "confusion" into the situation. *Id.*

In its written findings of fact and conclusions of law, the court ruled that the interview was a custodial interrogation, that Brownfield did not unequivocally invoke his right to remain silent, and that Stoppani's "follow-up question was made for the purpose of clarifying [Brownfield's] equivocal statements." Clerk's Papers at 134. The court went on to explain that "[b]y affirming Detective Stoppani's understanding and proceeding to speak with the detective, [Brownfield] waived his right to remain silent," and finally, the court found that Brownfield's "statements were freely, intelligently, and voluntarily made," and were therefore admissible under CrR 3.5. *Id.*

## III. Jury Trial

### A. HB's Testimony

HB testified that during the years that the abuse took place, she lived with her grandparents and Brownfield lived in a trailer on her grandparents' property. HB testified that Brownfield sexually abused her repeatedly. She explained that there was a pattern of abuse and that she tried to repress the memories for years so some of the memories blend together but she does clearly remember a select few instances of abuse. HB did not tell anyone at the time that she was being abused out of fear that she would be in trouble.

HB described three incidents of abuse during her testimony. During the first incident of abuse, HB was laying on top of Brownfield watching a movie when he touched her "with his fingers on [her] vagina and [her] butt," underneath her clothing. 1 VRP at 428. During this incident of abuse, Brownfield asked HB to lick his penis and she did. HB believes the incident ended because her grandma rang a bell, signaling it was time for dinner. She testified to what Brownfield was wearing at the time and said that the abuse occurred on the couch in his trailer.

HB testified to a second specific incident of abuse which occurred when she was five or six years old. In this incident, she was wearing a diaper and went over to Brownfield's trailer. She said, "I went over to his house. I told him that my diaper needed to be changed. So he took my diaper off and then performed oral on me." *Id.* at 432. This incident occurred on the floor of the hallway, between the bathroom and bedroom of the trailer. HB clarified that by saying "performed oral," she meant that Brownfield licked her vagina. *Id.* at 433. After doing so, Brownfield rubbed his penis on HB's vagina, stomach, and butt until he ejaculated on her.

The third specific incident of abuse that HB testified to occurred on Brownfield's bed and involved mimicking a scene from one of Brownfield's pornographic magazines. HB testified that during this incident, Brownfield licked her vagina. Then, Brownfield attempted to penetrate HB but HB told him that it hurt. Brownfield masturbated until he ejaculated on HB's stomach.

B. Brownfield's Text Message

In February 2020, after reporting the abuse to police and waiting until she felt prepared to press charges, HB worked with Detective Stoppani on a wire order in an attempt to elicit a confession from Brownfield. HB testified to the following exchange of messages, which were admitted as exhibit 1 at trial and read to the jury:

5

[HB:] I need to know...I'm trying to allow my heart to heal and forgive. I need closure and I need to know why. Why did you molest me when I was little? What do you have to say for yourself? I can't live like this anymore asking myself why and feeling like I'm to blame for all the problems in this broken family. Be honest with me dad. Why did you hurt me?

[HB:] Do you have anything to say to me...after all these years...I can't go on feeling like I'm the [f**k] up and like I'm the one who did wrong

[BROWNFIELD:] Sorry just woke up

[HB:] And?

[BROWNFIELD:] I'll call you when I getoff work to night

[HB:] I don't want to talk on the phone. I can't stand to hear your voice it makes me sick. I just want it all to end

[BROWNFIELD:] Then I'll text u when I'm done today ok

 . . . .

[HB:] Can you take 2 second to tell me why you molested me when I was a child. Say something so I can move on with my life

[BROWNFIELD:] I'm sorry i never ment for that to happen because I could never say no to you i was [f***ed] up an very weak. I told the devil that i won't ever do anything to harm or hurt you. I daired him to try and get me to do anything to harm in a sick way was redickisly [sic] impossible never ever could happen. I don't deserve your forgiveness but I hope you will some day i love you more than anything else i will text you very soon as I think about this some more on this ok again please forgive me for the way i had behaved with you back then.

Ex. 1 at 6-12.

C. Brownfield's Testimony

Brownfield also testified during the trial. He denied sexually abusing or molesting HB. His testimony largely focused on his history of drug use, unreliable memory, and claims that he was on drugs and hallucinating on the day that he was arrested and interviewed. He also discussed his low reading level and learning disabilities. He explained that he apologized to HB in response to her asking him why he molested her as a child not because he did it, but rather because he wanted to apologize for not being a father to his daughter and acknowledge that the fact that she got hurt signified a failure on his part.

D. Other Evidence and Verdict

In addition to HB's testimony, the prosecution presented testimony from Detective Stoppani. The video recording from Stoppani's interview with Brownfield was admitted into evidence as exhibit 4 and the recording was played for the jury.[1]

The jury found Brownfield guilty of three counts of child rape. As to each count, the jury returned a special verdict finding that Brownfield should "have known that the victim was particularly vulnerable or incapable of resistance." 2 VRP at 695-96. Additionally, the jury found that each count was "part of an ongoing pattern of sexual abuse of the same victim under the age of 18 years manifested by multiple incidents over a prolonged period of time." *Id.* Finally, with each count, the jury found that Brownfield and HB were members of the same family or household.

ANALYSIS

EQUIVOCAL STATEMENTS

A. Standard of Review

In reviewing a CrR 3.5 hearing, we ask first if the findings of fact are supported by substantial evidence. *State v. Gasteazoro-Paniagua*, 173 Wn. App. 751, 755, 294 P.3d 857 (2013). Next, we review whether conclusions of law were properly derived from findings of fact de novo. *Id.*

B. Legal Principles

Once a suspect invokes their right to remain silent, the interrogation must cease. *Miranda v. Arizona*, 384 U.S. 436, 473-74, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ("If the individual

---

[1] Prior to deliberations, the State moved to dismiss the count of child molestation because although the State expected HB to testify about an instance of child molestation, HB did not ultimately testify in support of the molestation count.

indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."). The invocation of the right to remain silent must be unequivocal and unambiguous. *State v. Piatnitsky*, 180 Wn.2d 407, 412-13, 325 P.3d 167 (2014). Our supreme court has held that "[t]o be unequivocal, an invocation of *Miranda* requires the expression of an objective intent to cease communication with interrogating officers." *Id.* at 412 (footnote omitted).

However, an individual's "right to remain silent may be waived if the State proves by a preponderance of the evidence the waiver was knowing, voluntary, and an intelligent relinquishment of a known right." *State v. Wheeler*, 108 Wn.2d 230, 237–38, 737 P.2d 1005 (1987). A waiver may be inferred from context, it need not be explicit. *Id.* at 238. For instance, when an individual "freely and selectively responds to police questioning after initially asserting *Miranda* rights," a waiver may be inferred. *Id.*

When an individual invokes the right to remain silent, and then proceeds to waive that right, courts may consider the following factors to determine whether the waiver is valid: (1) whether police scrupulously honored the individual's right to end questioning; "(2) whether the police engaged in further words or actions amounting to interrogation before obtaining a waiver; (3) whether the police engaged in tactics tending to coerce the suspect to change his mind; and (4) whether the subsequent waiver was knowing and voluntary." *Id.*

C. Application

Brownfield contends that he unequivocally invoked his right to silence when he said, "No" in response to Detective Stoppani asking, "[D]o you wish to talk to me now?" after reading Brownfield his rights. VRP (CrR 3.5 hearing) at 3. The State responds that Brownfield's statement was equivocal because, first, Brownfield interrupted Stoppani as Stopanni tried to confirm

Brownfield's wishes, saying, "— You can talk. You can talk all you want. I'll listen." *Id.* And second, when Stoppani again sought clarification from Brownfield, Brownfield agreed that he was willing to talk to Stoppani, but he might not actually say anything to Stoppani. Stoppani asked Brownfield, "Am I correct in what I'm understanding?" *Id.* at 4. Brownfield affirmed that Stoppani's understanding was correct.

We agree with the State and the trial court. While Brownfield did initially appear to invoke his right to remain silent by responding, "No," when asked if he wished to speak with Stoppani, that invocation was immediately revoked and made equivocal when he said, "You can talk all you want. I'll listen," and then confirmed Stoppani's understanding that he was "willing to talk to [him], but [he] might not say anything." *Id.* at 3-4.

Brownfield further argues that even if the trial court correctly determined that his first claimed invocation of his right to remain silent was equivocal, he later unequivocally invoked his right to remain silent during questioning when he said "I don't care to talk about this . . ." Ex. 4 at 10 min., 48 sec. The State, in its response, correctly notes that Brownfield did not raise this argument below when the trial court held its hearing on the admissibility of his statements and contends that this statement, like the other, was equivocal in light of the surrounding context of the statement. We agree with the State and hold that Brownfield's purported invocation of his right to remain silent was equivocal in light of the circumstances surrounding the statement.

Detective Stoppani said to Brownfield, "You say that things can be explained in court but I'm going to give you a chance to try and explain what [HB has] told me, because when a girl comes onto a guy, it's kind of odd, so is that, is that what went down?" *Id.* Brownfield responded,

"Maybe. I don't care to talk about this, I feel disgusted with myself given this whole situation. Just f***ing kill me or I'll kill myself. It's all over. My life is over. Everything is over." *Id.*

While Brownfield indeed said, "I don't care to talk about this," he then continued to make statements in the same breath and without pausing. The next video clip of the interview picks up with Brownfield continuing to talk, during which he said, "Yeah, I was a piece of shit. . . . Yeah, my daughter came onto me so f***ing what. I was f***ing weak." *Id.* at 10 min., 49 sec. In this context, it is clear that the phrase "I don't care to talk about this," was not an invocation of his right to remain silent, much less an unequivocal one.[2]

We find no error in the trial court's conclusion that Brownfield did not unequivocally invoke his right to remain silent during his interview with Detective Stoppani, nor in the trial court's decision to admit Brownfield's statements at trial.

### CONCLUSION

The trial court did not err in admitting Brownfield's statements. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

---

[2] Because we conclude that no constitutional error occurred, we need not conduct an analysis of the reviewability of this claim under RAP 2.5(a)(3).

CRUSER, A.C.J.

We concur:

MAXA, J.

VELJACIC, J.